Case number 13-4002, Paul Decker, et al. v. GE Healthcare, Inc., et al. Argument not to exceed 15 minutes per side. Mr. Bergeron, you may proceed for the appellant. Thank you. Good morning, Your Honors. May it please the Court that I'd like to reserve three minutes of time for rebuttal. Your Honors, there was a series of fundamental errors here that impacted the fairness of this trial. And in my limited time this morning, I'd like to focus on refusal, where the judge revealed that he could not be fair and impartial. Sanctions, where GE was sanctioned under the inherent authorities despite no finding of bad faith and no prejudice. And doubt, where there were issues implicating an unequal playing field between the plaintiff and defense experts that resulted in the exclusion of admissible and helpful testimony. Your Honors, with respect to refusal, this is a truly remarkable scenario where a district judge post-trial acknowledges that he cannot be fair and impartial. Where did he say that? It's in his order where he says, I'm going to recuse myself because I cannot be fair and impartial. He said I cannot be fair and impartial? That's exactly what he said. And he said it in the context of the prejudgment interest motion that was filed by the plaintiffs. And what he said is, because I'm so heavily involved in settlement, I cannot be fair and impartial in evaluating this issue. Well, what he more precisely said was that he thought he was actually a fact witness to the conduct of the parties during settlement proceedings. And whether or not he thought he might have a preconceived judgment about the way the parties had conducted themselves in settlement that might either actually or reasonably be said to influence his evaluation of the prejudgment interest. Isn't that a fairer and more complete way to characterize his ruling? Your Honor, I respectfully disagree with that. He said, first and foremost, he cannot be fair and impartial. And then he said, plus, I may be a witness. Now, what's important there is no one said he was going to be a witness. No one said we're going to call you as a witness, Judge. And there's not a— But you think he thought he might not be fair and impartial? Your Honor— Other than that he had an opportunity to observe the settlement process. But that's the purpose, Your Honor. I mean, that's the point, Your Honor. In prejudgment interest, we've not found a single case in Ohio anywhere, nor have they, where a judge is a witness or recuses himself or herself in evaluating them. We expect the judges to bring their personal experiences to bear. That happens every day in these proceedings. So his disclosure that he could not be fair and impartial is actually remarkable and shows that he has a deep-seated favoritism or antagonism. Mr. Bergeron, you can tell that you made a statement. Both judges jumped in right away saying, wait a minute, where did you say that? I just want to make sure that you're referring to the same statement that I think you are. Sure. One of the things that he said—and he said—he commented on this on two different occasions, initially and then subsequently. Are you referring to his statement that says, quote, because I was so heavily involved in personally trying to mediate a settlement before trial, I do not think I can be fair and impartial in deciding whether either party negotiated in good faith? That's correct. Was that the statement? That's correct. So you can see where we're going here. Yes, there are the words, I do not think I can be fair and impartial. You're correct that he said that. But it's prefaced by because of something, and it's concluded by saying whether either party negotiated in good faith. So what you want us to do is you want us to infer from either a part of that, or hopefully all of it, that therefore he was not—his—whatever caused him to say that prevented him from being fair and impartial during the trial. That's the issue. Exactly. Now what do we have—I understand how as an advocate you can make the argument from that statement. But it seems to me that it would certainly help your cause if you could then point to something that he didn't do during the trial that demonstrates what you claim he admitted to have been some sort of antagonism during the trial. And are there anything other than all these issues you're raising about, well, I think he ruled wrong here, he ruled wrong here. Did he do anything other than what a judge normally would do during a trial? Your Honor, I guess the way I would answer that is that if you go back and you look at what happened in the trial and leading up to the trial, we've lost every significant jump ball at the trial. And he reversed course on several of his rulings leading up to trial and the admissibility of evidence on jury instructions. And so if you look at that, and this is what the Third Circuit said in the interim decision, if you look at that in vacuum, you may not say, you know, boy, that's evidence of prejudice, but you look at it through the lens of the disclosure, and that's where you say, you know what, he made a disclosure, and it was purely based on pretrial activities. That's the significant point I want to convey is it's based on what happened pretrial. So he had those views formed prior to trial, and that's why he should not have been presided over the trial. And to what extent should we consider these views, what you want us to deduce from this one statement, to be informed by what he then subsequently says in explanation? Exactly. So here's my response on that. His second order, he says, my first order was not based on my lack of impartiality. But, of course, he does not attempt to, you know, distinguish or discuss his disclosure. And secondly, he says, I'm refusing myself so that I can have a role in settlement. What I would direct your honor's attention to is Record Entry 284 Exhibit 4. It's an email exchange between the judge and our settlement counsel. And in that exchange, he says unequivocally, I will have no role in settlement anymore if you guys don't resolve this prejudgment interest issue. So on the one hand, he's telling us, I'm not going to have a role in settlement. And then he's trying to explain away his recusal as, oh, I'm trying to preserve my role in settlement. And the question is, what would a reasonable layperson think about this? And would a reasonable layperson harbor some doubts as to the judge's impartiality? And I think particularly when you look at kind of the chronology of what happened and those disclosures, the answer is yes. And if it's a close question, it goes in favor of recusal. We all on this panel either are or have been district judges, which perhaps is unusual in this area. I don't think it would be unusual if you're a district judge out of abundance of caution to seek and obtain the permission of the parties before you engage in settlement, simply to head off these sorts of issues later on. So obviously, Judge Poster was intimately involved in settling apparently a whole lot of cases. Is there either some individual or global sign-off by other lawyers for him to have played this role in settlement? I'm not sure if there's anything in the record to that effect, Your Honor. I mean, obviously, we went into the settlement discussions voluntarily. Well, that's what I was going to say. Nobody objected. Everybody knew that it was just— But what I would say on that is we went into it assuming that the judge could maintain his impartiality. And we had no idea. I mean, we had no idea until he disclosed, I can't be fair and impartial, that there was an issue there. And that's significant. Well, the issue that he had to decide on prejudgment of interest is whether, essentially, the parties were negotiating in good faith, in some way. Correct? Are you suggesting that, based upon his experience trying to settle this case, along with the hundreds of other of the MDLs that he was trying to—other cases within this MDL that he was trying to settle, that he acquired some view of your attitude toward settlement that affected the trial? Is that where you're going with this? Absolutely. Absolutely, Your Honor. And this is the whole purpose. You don't recuse yourself for impressions you develop during the course of litigation unless they are so strongly held that it impairs your ability to be fair and impartial. But what he said in his order is that I can't be fair and impartial because it's likely that I'll have to be a witness. And if he has to make a conclusion or draw a conclusion about a good faith or bad faith, he has to glean the information based upon what was said and what was done. And why shouldn't we just view this as an application of Rule 605 of the Federal Rules of Evidence? And he was simply trying to be faithful to that. Well, Your Honor, I would disagree with the premise, which is he said, I cannot be fair and impartial because of my involvement in settlement, period. And then he says, plus, I may also be a witness. So that is the issue. Let's take it one step further then. Let's assume that it creates the problem that you say it creates. It looks to me like there are two views on this issue of partial recusal. And the view that you are asking us to adopt is in the distinct minority. If I'm right about that, if the majority view says you can partially recuse yourself, then it seems to me that is an additional reason why we would focus in on, was this lack of impartiality that I'm assuming by question directed only to the prejudgment, interest, good faith negotiation question, or did it permeate the whole time? Well, and I mean, if you look at the transcript, every hearing we were in front of him, he's expressing this frustration that we have not settled. He did not want this case to go to trial. And so I think a fair reading of the entire record is he got too close to settlement based on his disclosure and held it against one of the parties. Do you cite to those examples? You say every time you got together he's essentially doing something improper or he's telegraphing a bias. Is that supported by what you said? Well, Your Honor, I think what we cited was a number of examples where he reversed his decision leading up to trial. There's also myriad examples in the trial that we did not go into every single detail in the brief, obviously. But on your partial recusal point, the only cases that have gone the other way on that don't involve any interpretation of 455. And I think a fair reading of this en banc decision in Aetna is that this court has said, once you recuse, all you can do is ministerial acts. You don't rule on other issues that are substantive in the case. You're out once you make that decision. So you're saying that the statute doesn't allow for partial recusal? Absolutely. Absolutely. Well, that happens all the time. I think we've only found three examples where it has happened and the court has said, yes, that's permissible. Well, the Aetna facts are based on a relative, aren't they? Where that issue then did permeate all the other cases. So the Sixth Circuit is saying you have to recuse yourself on this particular one, and so therefore you can't handle the other cases because it's the same issue applies. But I think this court was also clear that once that decision is made, it's ministerial orders only that the judge can make decisions. Well, it depends on what it is. You know, you can have situations where a conflict develops through the course of litigation. And from that point on, it may be a conflict of the nature that from that point on, you recuse, but that doesn't call into question everything the judge has done up to that point. This particular recusal did not involve a conflict that was going to exist in the future. It was a conflict with respect to, as people might call it, conflict. It was a problem regarding a particular issue because of the incurred presence of the judge. But that's a different situation entirely. But the whole issue goes to whether he harbored that bias at trial and whether he was holding it against us because he— I believe he was holding it against yourself. All right. Your Honor, may I have just a minute on sanctions? I have one quick follow-up question on this recusal issue. I just want to see where this stands in the big picture. Sure. You're the only defendant in this MBL case, right? You produced this substance used in—that I can't pronounce, used in— Ketamine. Okay. I take it that there are still other cases ending aside from this one. So here's the state of play in the MBL. There is one case left that is yet to be remanded. Judge Bolster put on the order saying this has to be settled by a date cert. If it's not settled, it's going to be remanded. And the other handful of cases have been remanded to the transferable courts. He has put on another order that says we're not accepting any more cases. So at the end of the day, this is it. This is the only case at issue here. And I just do want to be clear that we're not suggesting any broader implications. All we're suggesting is we want a new trial in this case. Well, that's exactly where I was going with this question. If we agreed with you, what impact would that have on the bigger picture? No. No. Let's just follow—let me follow through with that one more area because I didn't anticipate the answer that you just gave. It seems to me—and maybe you're the only one that can raise this— So should we be worried about that or not? No. You should not be worried about that. And the reason for that is his disclosure and our argument is based on his conduct in this case, not in the broader NBL. Well, that's your argument today. No. No. No. Well, I will represent to you, Your Honor, that we are not— if you come back and say reverse, new trial because of recusal, we are not going to go back and try to reopen anything. We have settled those cases. They are over. The money has changed hands. And we are not seeking any order broader than a new trial in this case. What about other parties in the remanded cases trying to use whatever precedent we might create if we agreed with you to set aside rulings that will happen to all parties? Well, I think, Your Honor, on, for instance, Dauber or something like that, the other judges can revisit those issues in the normal course. But you're not waiving the right in these other remanded cases to ask those judges to revisit the global Dauber decisions that everybody understood applied to all cases because of what then turned out, in your estimation, to be this bias. Well, what I would say on that is we are not going to go in our remanded cases and say there's a bias, therefore give us some relief. What we would may well say is the Dauber rulings were wrong or they should not apply to this case for these reasons. And would one of the reasons be that the judge was biased when he made the rulings? Not in the context of the broader NDM, but the rulings that we are challenging are the ones that he made in this case in the neck of the woods. But are you waiving the right to use this disqualification issue in connection with whatever arguments you might make to the transfer or courts in the remaining cases? If I understand your question correctly, the answer is yes. Our only argument for his recusal is in this case, in the Dauber case. And we don't believe that it has any applicability to the other cases. Are you asking those judges to revisit rulings that Ulster made that would then apply when they went back to the transfer? I'm sorry, I didn't hear the first part of your question. You're including in that the fact that you won't use this recusal issue to try to impugn his rulings that apply when the cases go back to the transfer or courts. Is that right? Right. I would still argue that those rulings were wrong. Yeah, exactly. Exactly. Yes. I got it. Yes. I realize I'm over, but may I have one minute on sanctions or no? You know, I'm sorry that you didn't have the opportunity to talk about one of your issues. But this is the one you chose to leave with. Okay. Fair enough. Thank you. We will not strictly hold you to rebuttal in terms of only addressing only issues that were addressed by your adversary. Thank you. Okay. Good morning. May it please the Court, my name is Chris Casey, and with Michelle Parker, my partner, we represent Paul and Karen Decker. We respectfully request that the rulings below and the judgment below be affirmed in this case. There are multiple issues that were addressed in this appeal. It seems that the Court is most concerned with the issue of recusal. I think that your adversary is most concerned with the issue. I'm not sure that the judges shared that other than we had a lot of questions about it. Unless there is a particular area, because there were multiple issues raised. I will focus on the recusal issue, briefly addressing the other issues as it becomes appropriate. I think it's important, Your Honor, judges, to realize that this case is an MDL and it is a unique circumstance. The judgment is very, very clear. And just so the Court really understands where this came into play. After the judgment in this case, the judge would be called upon to decide whether or not one party or the other party engaged in settlement negotiations. And he would have to make that call. Now, some of the questions from the panel, particularly the questions from Judge Lawson, seem to suggest that the judge had already been involved in settlement discussions prior. What the judge was most concerned about, what he made clear in his subsequent order, was that he continued to administer an MDL and he continued to be involved in settlement discussions, not only involving this plaintiff and this defendant, but multiple defendants and multiple plaintiffs. His concern... We'll stop right there for just a second. At least I got the impression that he had been personally involved in settling some 600 cases. Correct. All of which involved this defendant. I'm not concerned myself whether there might have been other defendants as well, but in all of these cases where he was personally being the settlement official, how many involved this defendant? Roughly, if you know. I believe that he says here 600 cases have been resolved, a majority of which had my direct assistance. I think over half of those involved GE Healthcare, but many of them involved several other manufacturers of gadolin-based contrast agents that were issued in the case. In addition to having resolved cases in the past, he continued to administer the MDL for the benefit of multiple plaintiffs and multiple defendants. He continued to be involved in settlement, or at least at the time that he was resolving, deciding the issue of recusal in this case, he was involved in settlement negotiations with GE Healthcare. And what he was concerned about... Mr. Bergeron has said somewhere, I'm sure, in these pleadings, that after this hurtful happened, that he didn't involve himself in any more settlement. You know, Your Honor, I'm not privy to what GE Healthcare may or may not have done afterwards. I'm one party in this case. But I will tell you this. At the time that he made the decision to recuse himself, and he was very clear, okay, he said, that he was involved in settlement negotiations, not only with GE Healthcare, but with other defendants. And so at the time... Are you making reference to his statements in the order denying the motion to recraft? Correct. He said, and I'm quoting here, he said he was concerned if he was forced to rule on GE plaintiffs and GE's good faith in pursuing pretrial settlement, then my ability to assist plaintiffs and defendants, including GE, in settling the remaining cases might be impaired. My ability to approve numerous penalty settlements might also be impaired. And what the courts that have decided the issue of partial recusal made clear is that for purposes of prudential purposes and for purposes of deciding and administering a case, that there are occasions where you don't want judges doing this all the time, but there are occasions where it is appropriate to recuse yourself on a particular issue. And so with the judge, I mean, you know, what really is ironic here is rather than revealing a bias in favor of a particular party, what the judge was trying to do was preserve the integrity of his road, trying to preserve his impartiality so that he could continue not only to preside over the MDL and any other trials that may present before him, but also to continue to try to successfully administer and resolve this case. And I will tell you, this judge over six years was actively involved in almost every aspect of this litigation. He was diligent, and he was – I mean, all you have to look at is his dowry orders and the different orders he took. He was very, very careful and was very prudential in the way in which he approached the case. Let me follow up on this because one of the questions I asked Mr. Bergeron is aside from the wording that he used that's given rise to this issue, did he do anything else in conducting the trial that would corroborate this claim that he had developed an animosity or a bias before this trial started? And one of the things that Mr. Bergeron has pointed to this morning and in his briefs involves the Daubert rulings and the judge having reversed himself or changed course in some of the rulings. So it does seem to me that even though Mr. Bergeron didn't get to that because he ran out of time, that part of the appeal on the Daubert issues and this issue do seem to be related. So I would be interested in your views on that. Yeah, I don't think he ever did reverse himself. Take, for example, the issue which counsel brought up, the decision not to give an instruction on adverse events. It is typical in cases that once a judge hears the evidence as it rolls out in a case, they may decide whether or not a particular jury instruction in which they initially thought might be relevant at a pretrial stage is actually going to be helpful to help the jury decide the case. When all the evidence came in in this case, for example, on the adverse event instruction, for example, the court could realize that A, the issue of causation had been not opposed, the issue of either general or specific causation, whether or not Mr. Daubert's NSF was caused by exposure on the stand, and that plaintiffs had not put on a scintilla of evidence that would suggest that adverse events was a cause. So the whole suggestion that there be an adverse event instruction was, he found, that there was no need to give that. He described a basis for doing that in the denying of a pretrial. You're answering my question in the context of jury instructions. That's an example. Well, I'm just suggesting that that example may not be responsible. Okay. What Mr. Bergeron says is he had made Daubert rulings, which I assume he meant what experts could or could not testify to, and then he changed those. He did not. To my knowledge, he was very clear from the beginning. In fact, I think he bent over backwards to give the parties a chance. For example, the initial Daubert ruling, which I believe was over 50 pages long, considered each and every aspect of every challenge to expert, defended the health care move for reconsideration. He not only reconsidered, he changed some of his rulings. That's what the question was. That's what I'm trying to get at. He changed it in his favor. Obviously, the only – he wouldn't be complaining about something changed in his favor. He must be focusing in on a ruling that said his expert could testify to something and then changing his mind to say, no, at the trial, you can't testify to something. I did not perceive that, Judge. I mean, you know, I tried. Did that happen? I don't think it did. I didn't see it happen at the time of trial. Clearly, at the time of trial, every judge makes judgment calls as they go through the trial. But I can't, looking back, think of an instance where he changed a major ruling with respect to a Daubert issue or something he had decided ahead of time. The only thing I could think of was the issue that Mr. Bergeron and Cheeky made in their brief, which was the initial decision to give a jury instruction on adverse events and then change that. So that was the inference that I made, perhaps. But the issue of refusal, there is a second issue. Even if the court were to find that the judge should have accused himself, the Lillenberg case makes clear that that does not necessarily, and in fact, it's the rare case, where you would vacate a verdict. You would have to conduct a specific fact-intensive discussion, evaluation, of the circumstances surrounding the failure of the accuse in order to determine whether or not it is appropriate to vacate, particularly a jury verdict. And in this case, there really is no indicia of either wrongdoing or favoritism during the course of the trial that would suggest in any way that the court should do that. And in fact, I would— Mr. Bergeron's argument, using his words, were there was a series of jump ball questions, and they lost everyone. So therefore, that corroborates the fact that he really was fined. I can think of many instances, frankly. I was cross-examining the defendant's pharmacovigilance expert, one of the last witnesses in the case where the judge basically told me, told me, you know, Counsel, I think you've had enough. Sit down. There are plenty of times during the course of a trial, I'm certainly looking in retrospect, where a party wins an issue, a party loses an issue. And I think that if any objective jurist looking at the trial of this case would look at it in its totality, not as an advocate, but in its totality, and look at the judge's, Judge Polster's conduct at this trial was exemplary. It truly was. I'm not saying that every judge would make every ruling the exact same way, but this judge's temper, his temperament, his rulings were all squarely within the bounds of the law. I really can't think of one where he, I mean, there once went against me, Judge, and if I were on the other side, I would maybe be arguing that, you know, he may have been wrong in his interpretation of various laws. But the truth of the matter is this case was tried very well. And certainly there is no evidence in this case that would suggest that a properly rendered jury verdict be vacated. And in fact, it would be really prejudicial because I think the court is aware that if we had to retry this case, Mr. Gecker is no longer with us, so he would not have the ability to testify in the case. So to take, to vacate a proper jury verdict on failure to warn is a very serious matter. And I think the Littleburg case, and I believe the Tolbert v. United States case in this circuit, is very clear that you have to go back and you have to look at the facts surrounding the refusal or failure to recuse before you decide to reopen a verdict, which is a very serious thing. I'd like to, since Mr. Bergeron suggested that he might raise the issue of sanctions, I want to be very clear that the judge was very appropriate in the way in which he handled the sanctions issue. He was, that is, again, a circumstantial. He took a very measured approach. This was an instance where we were reading various rulings on this issue. Keaton Health Care had a particular study and information about a study that had been held during the course of discovery and certain documents relating to Keaton's had been destroyed. And the question was whether or not that had been done intentionally. Is that an instance where the ruling was altered at the time that Murphy testified, or shortly thereafter? Or was he consistent with that? In fact, he was so consistent with that in trying to help Keaton Health Care that he offered Keaton Health Care the opportunity to stipulate the facts of the destruction. And Keaton Health Care declined to do so, forcing him to say, OK, well, if you're not going to stipulate it, we're going to have to have the testimony of your witness come in and testify to it. Because if you don't allow that testimony, how else is the plaintiff going to explain to the jury the fact that all of the witnesses appeared by videotape? Again, this is an MDL case, so it's very important to realize the context of this. The Plaintiff's Steering Committee, which was involved in developing the evidence in the case, had spent two years deposing witnesses in Norway, Denmark, Belgium, and the United Kingdom. We had them all on videotape. The very last witness in the case testified. And we had been asking all along for information about Dr. Moeller and Dr. Moeller's studies. And we were told it didn't exist, it didn't exist, it didn't exist. And at the very last moment, after all the deposition had been taken, Dr. Moeller walks in and says, by the way, I have the report. And the court, and then upon investigation, it turns out she had the report. And not only had the report, but had a lot of documents surrounding Dr. Moeller that had been destroyed. And the court had closed door hearing about the issue, issued several rulings about it. In fact, put those rulings under seal for the protection of Virginia health care. We were placed, we asked for a spoliation instruction, which the court declined to give. But the point, but the court also realized that we were prejudiced. Because we had asked for, we had, how else would we explain to the jury that if this study, showing the disintegration of the molecule involved in this case, the release of the toxic 3-gadolinium, how else would we explain to a jury that this study was so important, this witness was so important, yet we did not ask a single witness about this study. And so the judge allowed us to explain why there was an absence of evidence in light of the fact that most of this case came in via videotape. And the court made that ruling, and frankly, it was the right ruling to make. And what the defendant is claiming here is, Mr. Judge Polch was so biased. He could easily have found bad, that G Health Care had done. I see my time is up. I appreciate it. We would, Your Honor, for the reasons stated in the briefing, the rest of the briefing, we would ask that the judgment will be affirmed. Thank you very much.  I reserve three minutes, Your Honor. I asked for it, so I'll write it down. Judge McKee, to answer your question about the Daubert issue, it was the Lemme rule, Record Entry 162, where he cuts out all the gadolinium-naive evidence that we were going to have our expert testify to. He had cut out some of it before, but the last minute, he had said we could use the Lemme study, and the last minute he said, no, we can't, right on the EVA trial. So this was before the trial started? It was two weeks before the trial started. So it isn't the case, as would oftentimes occur, where something happened during the trial to then change your view of that stuff. Correct. But I assume he articulated his reasoning why he's excluding that, so we just need to look at that briefly. Yes, and I mean, the reasoning is really difficult to understand as to the basis for that. That's because you love it. Your Honor, if I could just mention briefly a few points on sanctions. This court requires bad faith conduct to impose inherent authority sanctions, and we have a finding here that there was no bad faith conduct. In fact, he found simply negligence, and this is per se reversal error under this court's precedent. They've made no articulation of an argument as to how we can be sanctioned under the inherent authority for something less than bad faith conduct or conduct in and of itself. And I want to impress upon the court. You're calling it basically a punitive sanction, but at least on its face it just seemed like the judge had a situation that if he didn't do something, there was a gap in the evidence that just wouldn't make any sense, and therefore my words would be sort of filling in that gap. So what's the matter with it? Well, because they're arguing that we were going to make some argument about, oh, there's no evidence about that. We never did that, Your Honor. And the point of the matter is look at what they got in through this. They got in testimony that we knew we had an obligation to preserve documents and that we destroyed documents. That was testimony by our in-house lawyer. Are those two things true? Those two things are true. So the jury got to hear something that's true. Maybe that's unusual. Your Honor, the whole point is we don't allow litigation conduct to come in front of the jury who has no appreciation for what the rules of discovery are or how this comes about. And we ask for limiting instruction to advise the jury that the documents that were destroyed were not relevant, as Judge Holster found, and that there was no bad faith on G.E.'s part. That's not your instruction request. The instruction, you asked the court to instruct the jury that it was likely that the documents wouldn't have helped the plaintiff's case. But how would anybody know that if the documents had been destroyed and nobody would presume? He made a finding in his sanctions order that the plaintiffs had not established the relevance of these documents. I'll try not to stay over this time. Thank you, Your Honor, for your respectful request. We appreciate it very much, Your Honor. We've done a pretty good job and we'll consider the case here.